**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GWENDOLYN P.,

               Plaintiff,

     v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

              Defendant.

Case No. 20 C 3339

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Gwendolyn P. challenges the ALJ's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Because the ALJ's decision is supported by substantial evidence, the Court denies Gwendolyn's motion for summary judgment [22] and grants the Commissioner's motion for summary judgment [26].

## BACKGROUND

Gwendolyn applied for DIB on June 20, 2017, alleging disability due to rheumatoid arthritis, osteoarthritis in both knees, degenerative arthritis in her cervical and lumbar spine, diabetes, high blood pressure, bulging disc in her cervical and lumbar spine, and left vocal cord paralysis since March 28, 2017. She is also obese and suffers from fibromyalgia and hypothyroidism. Gwendolyn was born on September 12, 1959 and was 59 years-old at the time of her administrative hearing. She completed high school and has past relevant work as a quality assurance manager. Gwendolyn last worked on March 28, 2017, when she was laid off.

On May 28, 2019, ALJ Luke Woltering issued a decision denying Gwendolyn's application. (R. 18-32). ALJ Woltering found that Gwendolyn's rheumatoid arthritis in the bilateral hands, degenerative disc disease of the cervical and lumbar spine, degenerative joint

disease of the right shoulder, degenerative joint disease of the bilateral knees, fibromyalgia, and obesity were severe impairments, but they do not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 17-19. The ALJ determined that Gwendolyn retained the residual functional capacity ("RFC") to perform a limited range of sedentary work except that she can frequently balance; occasionally stoop, kneel, crouch, crawl and climb ladders, ropes, scaffolds, ramps, and stairs; frequently push and pull with the bilateral upper extremities; occasionally overhead reach with the dominant right upper extremity; needs a cane for standing and walking; cannot work around hazards such as unprotected heights and exposed moving mechanical parts; and can frequently handle and finger with the bilateral upper extremities. *Id*. at 19-23. Based on the VE's testimony, the ALJ found that Gwendolyn is able to perform her past relevant work as a user support analyst as generally performed. *Id*. at 24. As a result, the ALJ found that Gwendolyn was not disabled from March 28, 2017 through the date of the decision. *Id*.

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education,

and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 US 197, 229 (1938)). "Although this standard is generous, it is not entirely uncritical." *Steele*, 290 F.3d at 940. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id.*

Gwendolyn raises three challenges to the ALJ's decision: (1) the ALJ's finding that her inflammatory arthritis does not satisfy the requirements of Listing 14.09D is not supported by substantial evidence; (2) substantial evidence does not support the ALJ's decision to find her treating physicians' opinions unpersuasive; and (3) the ALJ erred in concluding that Gwendolyn could perform her past relevant work as a user support analyst. Because the ALJ's decision is supported by substantial evidence, which is only "more than a mere scintilla," it does not require reversal or remand. *Biestek*, 139 S.Ct. at 1154.

A.      **Listing 14.09D - Inflammatory Arthritis**

The ALJ found at step three that Gwendolyn's impairments did not meet or equal Listing 14.09 for inflammatory arthritis.  "At step three, an ALJ must determine whether the claimant's impairments are 'severe enough' to be presumptively disabling—that is, so severe that they prevent a person from doing any gainful activity and make further inquiry into whether the person can work unnecessary." *Jeske v. Saul* 955 F.3d 583, 588 (7th Cir. 2020).  In considering whether a claimant meets or equals a listed impairment, "the ALJ 'must discuss the listing by name and offer more than a perfunctory analysis of the listing.'" *Id*.  The claimant bears the burden of showing that her impairments meet all the criteria of a listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

Gwendolyn contends that the ALJ erred at step three by failing to find her impairments meet Listing 14.09D.[1]  Listing 14.09D requires: (1) repeated manifestations of inflammatory arthritis, (2) with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and (3) marked limitation of activities of daily living, social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.09D.  The ALJ found that the record fails to reflect repeated manifestations of inflammatory arthritis, with at least two of the following: severe fatigue, fever, malaise, or involuntary weight loss. (R. 19).  The ALJ stated Gwendolyn's "treatment notes consistently reflect no fatigue, fever, weight loss, or depression." *Id*.  Last, the ALJ found that the record does not demonstrate a "marked limitation in activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." *Id*.  The ALJ explained that Gwendolyn

---

[1]      Gwendolyn does not argue that her impairments meet sections A, B, or C of Listing 14.09.

"testified at the hearing and reported numerous activities that she conducts unassisted and family members she interacts with, and [she] has stated she takes care of her mother." *Id*.  Gwendolyn contends that the record shows repeated manifestations of inflammatory arthritis with severe fatigue and malaise with a marked limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

The Court finds that no reversible error occurred at step three.  Gwendolyn first disputes the ALJ's finding that she did not experience "repeated" manifestations of inflammatory arthritis. (R. 19).[2]  The ALJ offered no separate analysis to support his conclusion that Gwendolyn has not experienced repeated manifestations of inflammatory arthritis. *Id*.  But regardless of whether the initial durational requirement of Listing 14.09D is met, substantial evidence does not support the additional findings of constitutional symptoms and a marked limitation required to meet Listing 14.09D.

As to the constitutional symptoms, Gwendolyn does not challenge the ALJ's finding that the record shows no fever or involuntary weight loss but argues that she suffers from severe fatigue and malaise.  "Severe fatigue" is defined as "a frequent sense of exhaustion that results in significantly reduced physical activity or mental function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.00(C)(2).  The ALJ noted that the treatment records consistently reflect no fatigue. (R. 19).  Specifically, the ALJ cited treatment notes on June 18, 2018, July 13, 2018, August 29, 2018, October 3, 2018, and January 25, 2019, in which Gwendolyn's rheumatologist Daniel Torres, M.D., wrote that she "reports no fatigue." *Id*. at 19, 1012, 1015, 1018, 1022, 1025.  Gwendolyn

---

[2]     Under the regulations, the term "repeated" means "the manifestations occur on an average of three times a year, or once every 4 months, each lasting 2 weeks or more; or the manifestations do not last for 2 weeks but occur substantially more frequently than three times in a year or once every 4 months; or they occur less frequently than an average of three times a year or once every 4 months but last substantially longer than 2 weeks." . 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.00(I)(3).

concedes that the ALJ correctly noted instances where she reported no fatigue to Dr. Torres but claims that the record shows a "greater number of times when [she] complained of severe fatigue." Doc. 21 at 6.  Gwendolyn cites only three instances after her alleged onset date, when she reported fatigue to her physicians, none of which was severe fatigue, and one documented complaint of "feel[ing] tired most of the time," which she attributed to new medication she was taking for fibromyalgia. (R. 737, 869, 875, 980).  Gwendolyn also notes that in an Adult Function Report dated August 2, 2017, she reported to the agency: "I will try [to] clean a little but I get fatigue and that stops me." *Id*. at 205  She further notes that in her Disability Report – Appeal filed on October 23, 2017, she stated: "I'm severely fatigued." *Id*. at 221.  The record as a whole belies Gwendolyn's assertion of a great number of references in the record to severe fatigue.  In fact, the medical evidence indicates a far greater number of instances in which Gwendolyn did not report any fatigue.  In addition to the five instances the ALJ cited, Gwendolyn denied fatigue on 18 occasions between April 11, 2017 and January 25, 2019. *Id*. at 481, 485, 563, 567, 572, 576, 642, 646, 651, 819, 824, 998, 1012, 1015, 1018, 1022, 1025, 1029.  Moreover, the ALJ did not fully credit Gwendolyn's own statements—a conclusion Gwendolyn does not contest.  Therefore, the ALJ's determination that Gwendolyn did not experience severe fatigue is supported by the lack of fatigue repeatedly noted in the treatment record.

Gwendolyn also contends the record shows she suffered from malaise.  Malaise means "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.00(C)(2).  Gwendolyn acknowledges that her physicians' treatment notes do not explicitly mention malaise. Doc. 21 at 6.  Gwendolyn points, however, to "joint stiffness, muscle aches, and swollen and painful joints" and side effects of medication including dizziness, nausea, and

drowsiness as evidence of discomfort and lack of well-being to establish malaise. *Id*. at 6-7. The Commissioner responds that those findings are related to fibromyalgia and/or rheumatoid arthritis and do not meet the definition of malaise. Even if Gwendolyn's joint stiffness, muscle aches, swollen, painful joints, and medication side effects could support her claim that she exhibits the constitutional symptom of malaise, the Court would nonetheless find that her arthritis did not meet Listing 14.09D. Malaise is only one of the two required symptoms for Listing 14.09D, and there is certainly more than a mere scintilla of evidence to support the ALJ's determination that Gwendolyn did not suffer from severe fatigue. Thus, Gwendolyn cannot establish the presence of "at least two of the constitutional symptoms or signs." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.09D.

Further, far more than a mere scintilla of evidence supports the ALJ's conclusion that Gwendolyn did not meet Listing 14.09D because she had no "marked" limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.[3] A "marked" limitation means that the symptoms of an immune system disorder "seriously interferes with [a claimant's] ability to function independently, appropriately, and effectively." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.00(I)(5). Gwendolyn asserts that her subjective statements at the hearing and in her Adult Function Report and Disability Report – Appeal forms support a finding of marked limitation in her ability to complete tasks in a timely manner due to deficiencies in concentration, persistence, or pace. The ALJ acknowledged Gwendolyn's testimony that "her memory had worsened due to pain and she was no longer able to remember information needed for her job." (R. 19, 41-42). The ALJ found, however, that Gwendolyn's subjective symptom

---

[3]     The ALJ's findings that Gwendolyn did not have a marked limitation in activities of daily living or maintaining of social functioning are not challenged by Gwendolyn.

statements were not entirely consistent with the medical and other evidence of record.[4]  With regard to Gwendolyn's memory, the record supports the ALJ's conclusion.  On one occasion in September 2017, Gwendolyn's treating physician Dr. Premesh Malapati assessed memory loss, and in September and November 2017, Gwendolyn complained of forgetfulness. *Id*. at 737-38, 824, 875.  But on six occasions thereafter, Gwendolyn denied memory loss. *Id*. at 841, 846, 853, 860, 983, 999.  And at all other appointments, Dr. Malapati did not assess any memory loss. *Id*. at 818-19, 837, 842, 847, 855, 861, 985, 1002.

The ALJ further considered the opinions of Drs. Torres and Malapati who respectively opined that Gwendolyn would be off task 15% and 25% or more of a typical workday due to arthritis symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (R. 23).  However, as discussed below, the ALJ legitimately concluded that the treating opinion evidence was not persuasive.  In discounting Drs. Torres's and Malapati's opinions, the ALJ found that Gwendolyn's rheumatoid arthritis had improved and her tender points had decreased with medication and the record did not reflect that her impairments resulted in time off-task. *Id*.  Drs. Torres's and Malapati's treatment records do not include any indication that Gwendolyn's impairments caused a concentration, persistence, or pace limitation. Rather, their treatment records show that she consistently appeared alert and fully oriented *Id*. at 482, 485, 564, 568, 573, 577, 634, 643, 647, 651, 655, 659, 737, 837, 855, 861, 869, 872, 876, 985, 1002, 1012, 1015, 1018, 1022, 1025, 1029.  Likewise, in December 2017, the consultative examiner Dr. Dilip Patel found that Gwendolyn was oriented and had normal memory, behavior, concentration, and ability to relate. *Id*. at 768.  Finally, state agency reviewing physicians Drs. Marion Panepinto and Colleen Ryan, whose opinions the ALJ found persuasive, found that

---

[4]      Gwendolyn does not contest the ALJ's subjective symptom finding.

Gwendolyn could perform a limited range of sedentary work with no limitation on her ability to concentrate, persist, or maintain pace on a sustained and full-time basis.[5] These are all legitimate considerations and the ALJ reasonably concluded that the record as a whole does not demonstrate a marked limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

Gwendolyn also points out that she reported and testified to limitations in her ability to perform daily activities which purportedly show she is markedly limited in completing tasks in a timely manner due to concentration, persistence, or pace deficits. Doc. 21 at 7-8. The ALJ analyzed Gwendolyn's daily activities and considered her reported limitations in carrying out her activities of daily living. (R. 19-20, 22). In that regard, the ALJ noted that Gwendolyn testified that "she has someone go with her to the store to carry groceries, and her daughter helps her with household chores." *Id*. at 20. The ALJ also pointed out that Gwendolyn testified that "her pain medications put her to sleep, and she needs to lay down two or three times per day." *Id*. The ALJ noted, however, that Gwendolyn's testimony and written reports showed "numerous activities that she conducts unassisted." *Id*. at 19. For example, Gwendolyn wrote that she was independent with showering, dressing, feeding, and cooking and that she did laundry once a week and washed dishes daily, although her daughter helped with more substantial housecleaning. *Id*. at 205-06. She also reported that she took care of her parents, drove, attended church weekly and her grandson's games and school events, and shopped in stores for groceries two or three times monthly. *Id*. at 205, 207-08. Gwendolyn also told her treating physician in November 2018 that she was caring for her mother. *Id*. at 980. At the hearing, Gwendolyn clarified that she does not help her mother with anything other than cooking and she no longer goes to church because it is hard for her to get

---

[5]    Gwendolyn does not contest the ALJ's finding that the state agency physicians' opinions were persuasive.

ready. *Id*. at 55-57. Based on this evidence, the ALJ reasonably found that Gwendolyn does have "some limitation" in performing her activities of daily living but concluded that her daily activities, taken together with the other evidence of record, suggest that she can perform work within the parameters of the RFC on a sustained and continuous basis. *Id*. at 22. In other words, the ALJ properly analyzed Gwendolyn's daily activities in the light of the limitations she described but reasonably found that they do not evidence a marked limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

More generally, Gwendolyn argues that the ALJ erred at step three by failing to specifically address evidence regarding the symptoms of her rheumatoid arthritis in her shoulders, feet, elbows, and hips. The ALJ identified inflammatory arthritis in Gwendolyn's hands. (R. 21). As for her shoulders and feet, Gwendolyn correctly notes that the consultative examiner Dr. Patel offered a diagnosis of tenosynovitis or rheumatoid arthritis of the shoulders, and her treating physician Dr. Malapati assessed rheumatoid arthritis involving both feet. (R. 769, 855). But Gwendolyn having received these additional diagnoses does not mean that she meets the criteria of a listing. *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018) ("It was [the plaintiff's] burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work."); *Sims v. Berryhill*, 2017 WL 3701968, at * (S.D. July 28, 2017) ("A diagnosis alone is insufficient to establish a listing has been met."). And critically, Gwendolyn does not explain how factoring in additional diagnoses of the shoulders and feet would have led to a different outcome with regard to Listing 14.09D at step three.

Moreover, the ALJ expressly considered Gwendolyn's degenerative joint disease of her right shoulder in assessing her RFC. (R. 20). The ALJ cited a September 2016 x-ray of Gwendolyn's right shoulder which showed moderate degenerative bony changes. *Id*. at 20, 378.

10

However, citing Dr. Malapati's records where Gwendolyn reported "some soreness" in her neck and shoulders on September 20, 2017, continued shoulder pain on November 9, 2017, and then shoulder pain improved with medication on January 9, 2018, the ALJ noted that Gwendolyn has generally shown only mild to moderate soreness in her neck and shoulders. *Id*. at 20, 822, 834, 844. The ALJ also noted the findings of the consultative examiner in December 2017 which showed normal, pain-free range of movements in her neck, only moderate stiffness in her shoulders, and only mild to moderate shoulder pain, though she did exhibit reduced range of motion in her shoulders. *Id*. at 20, 22, 768. As a result of her cervical spine and right shoulder impairments, the ALJ limited Gwendolyn to only occasional overhead reaching with her dominant right upper extremity and frequent pushing and pulling with her bilateral upper extremities. *Id*. at 19, 20.

Although the ALJ did not expressly mention Dr. Malapati's diagnosis of rheumatoid arthritis in Gwendolyn's feet by name, he cited to portions of the record at which Dr. Malapati noted Gwendolyn complained of pain in her feet, reported pain in her feet improved with medication, and x-rays of her feet revealed only minor degenerative changes, demonstrating the ALJ adequately considered the condition of Gwendolyn's feet. *Id*. at 20 (*citing id*. at 834, 844); *id*. at 21 (*citing id*. at 869). Moreover, when Gwendolyn's rheumatologist Dr. Torres opined about Gwendolyn's functioning in an Arthritis Medical Source Statement, he indicated that the only joints affected by Gwendolyn's arthritis were the small joints of her hands and not her feet. *Id*. at 967. Further, in evaluating Gwendolyn's RFC, the ALJ explicitly considered that Gwendolyn repeatedly exhibited normal ambulation, which suggests that the rheumatoid arthritis in her feet does not impose significant functional limitations. *Id*. at 21 (*citing id*. at 869, 1012, 1015, 1029);

11

*see also id*. at 872, 1018, 1022, 1025. Accordingly, the ALJ did not err by failing to explicitly mention Dr. Malapati's rheumatoid arthritis diagnosis in his decision.

Gwendolyn also complains that the ALJ did not address symptoms related to her elbows and hips at step three. While the ALJ did not specifically discuss Gwendolyn's elbows and hips, the ALJ was not required to "discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021). Any error in the ALJ's failure to mention evidence of Gwendolyn's swelling and tenderness in her elbows and tenderness in her hips was harmless under the circumstances. First, the ALJ did not ignore an entire line of evidence contradicting his decision at step three. The ALJ cited Dr. Malapati's November 9, 2017 treatment record, which evidences Gwendolyn's report of hip pain (R. 834) and his finding of swelling and tenderness in Gwendolyn's elbows as well as tenderness in both hips (*id*. at 837). *Id*. at 20, 21. This establishes the ALJ's awareness of these symptoms. Second, the ALJ considered the report of consultative examiner Dr. Patel on December 14, 2017, who found Gwendolyn's elbows and hips normal on examination. *Id*. at 20-21, 768. Third, the ALJ considered and found persuasive the findings of state agency medical consultants Drs. Panepinto and Ryan, who reviewed the record on December 20, 2017 and July 30, 2018, respectively, and opined that Gwendolyn could perform a reduced range of sedentary work. *Id*. at 72-84, 974. Fourth, Gwendolyn does not explain how the evidence of swelling and tenderness in her elbows and tenderness and pain in her hips should have led to a different result at step three. *Butler v. Kijakazi*, 4 F.4th 498, 504 (7th Cir. 2021). Specifically, she has not addressed how this evidence supports a finding that she meets the requisite constitutional symptoms or a marked limitation of Listing 14.09D, and she "had the burden of proving disability at step three." *Deloney v. Saul*, 840 F. App'x 1, 5 (7th Cir. 2020).

For all these reasons, the Court rejects Gwendolyn's step three challenge.

**B.    Treating Physicians' Opinions**

Regarding the ALJ's weighing of the medical opinion evidence, Gwendolyn challenges only the ALJ's assessment of the opinions of her rheumatologist Dr. Torres and her primary care physician Dr. Malapati.   In March 2018, Dr. Torres completed an Arthritis Medical Source Statement and checked boxes to indicate that Gwendolyn could lift and carry ten pounds rarely and less than ten pounds occasionally, walk two city blocks without rest or severe pain, stand fifteen minutes, sit 30 minutes at a time but less than two hours in an eight-hour workday, use her arms, hands, and fingers without limitations, occasionally twist, rarely stoop or climb stairs, and never crouch or climb ladders. (R. 968-70).  Dr. Torres also opined that Gwendolyn would need to shift positions at will, would need to walk for five minutes every half-hour, would not require unscheduled breaks or require an assistive device, was capable of low stress work, was likely to be off task 15% of the time, and would likely be absent about three days per month. *Id*.

That same month and using the same mainly check-box form, Dr. Malapati opined that Gwendolyn could lift and carry less than ten pounds rarely, walk one city block, sit and stand each for 20 minutes at a time but each for less than two hours total in an eight-hour workday, rarely twist, stoop, or climb stairs, and never crouch or climb ladders. (R. 976-77).  Dr. Malapati also opined that Gwendolyn could use her arms, hands, and fingers only 40% of the time, would need to shift positions at will but would not need to walk around during the workday, should avoid cold temperatures, would sometimes need unscheduled breaks to lie down, was likely to be off task 25% or more of the time, was incapable of even low stress work, and would likely be absent more than four days per month. *Id*. at 976-79.

Given Gwendolyn's filing date, the ALJ's evaluation of the medical opinion evidence was subject to new regulations pertaining to claims filed on or after March 27, 2017. 20 C.F.R. §

404.1520c (2017). Under the new regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id*. at § 404.1520c(a). The regulations direct the ALJ to consider medical opinions and prior administrative medical findings using several listed factors, including supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *Id*. at § 404.1520c(a), (c). Supportability and consistency are the two most important factors. *Id*. at § 404.1520c(a). In assessing supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." *Id*. at C.F.R. § 404.1520c(c)(1). As to consistency, "[t]he more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id*. at C.F.R. § 404.1520c(c)(2). In the decision, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." *Id*. at § 404.1520c(b).

The ALJ found the opinions of Drs. Torres and Malapati unpersuasive. (R 23). He explained that their opinions lacked supportability and consistency with the record. *Id*. The ALJ found that despite performing in-person examinations, the doctors provided little explanation for how Gwendolyn's impairments caused the opined limitations. *Id*. Moreover, their opinions that Gwendolyn needed the ability to switch between sitting and standing at will during an eight-hour workday and her impairments would cause her to be off task 15% and 25% or more of the workday were inconsistent with medical imaging showing only mild back and knee problems and the record which showed that her RA had improved and her tender points had decreased with medication. *Id*.

14

The ALJ further discredited the opinions of Drs. Torres and Malapati because Gwendolyn had identified numerous activities of daily living she could do herself. *Id*.

The ALJ provided sufficient reasons supported by the record for his conclusion that Drs. Torres's and Malapati's opinions were not persuasive. The ALJ permissibly discounted the Arthritis Medical Source Statements which consist largely of checked boxes with little explanation for the bases of their conclusions. A "[c]heck-box form[], unexplained, [is] generally weak evidence," taking on greater significance only when "it is supported by medical records." *Winkelman v. Saul*, 835 F. App'x 889, 892 (7th Cir. 2021); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). But here, the ALJ found that Drs. Torres's and Malapati's opinions were not consistent with or supported by the medical record. (R. 23). As the ALJ first correctly noted, imaging showed only mild back and knee problems. *Id*. at 23, 869, 938, 950, 953 962, 964. Second, treatment notes from Dr. Torres, cited by the ALJ, showed improvement in Gwendolyn's rheumatoid arthritis and her tender points decreased with medication. *Id*. at 21-23. Indeed, between September 2017 and January 2019, Dr. Torres repeatedly noted few or no tender points and assessed Gwendolyn's rheumatoid arthritis as stable. *Id*. at 737, 869-70, 873, 876, 1013, 1016, 1019, 1022-23, 1026, 1029-30. And as the ALJ recognized, as of March 2017 and on subsequent exams, Dr. Torres's notes stated that Gwendolyn showed no joint tenderness or swelling and normal range of motion. *Id*. at 21, 479, 482, 485, 737, 876, 1013, 1016, 1019, 1022, 1026, 1029.

Further, Dr. Malapati noted on several occasions that Gwendolyn's rheumatoid arthritis was controlled or improved on medication despite some variable symptoms. *Id*. at 818 (7/28/2017: "RA controlled with MTX [methotrexate]."); *id*. at 822, 824 (9/20/2017: "Doing well"; "RA controlled with MTX"; "RA-hands and feet, improved and less warmth."); *id*. at 844 (1/9/2018: "RA in hands, jaw and shoulders and knees and feet – improved with meds."); *Id*. at 851 (2/6/2018:

"RA in hands, jaw and shoulders and knees and feet – improved with meds."); *id*. at 996 (5/1/2018: "had R knee steroid injection and pain improved" and "feels better – RA symptoms improved."). The ALJ was entitled to discount Drs. Torres's and Malapati's opinions due to lack of support in their own records. *Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021) (an ALJ may decline to credit a treating physician's opinion "when the opinion is inconsistent with the physician's treatment notes."); *Recha v. Saul*, 843 F. App'x 1, 5 (7th Cir 2021). Finally, the ALJ permissibly discounted Drs. Torres' and Malapati's assessment of Gwendolyn's limitations based on their inconsistency with her reported ability to independently manage numerous activities of daily living, such as preparing her own meals, doing laundry and dishes, driving, handling her own finances, decorating her home, and attending her grandson's games and school events. *Id*. at 22, 23, 46-47, 50, 206-08; *Gebauer v. Saul*, 801 F. App'x 404, 410-11 (7th Cir. 2020) (ALJ properly discounted treating physician's opinions which conflicted with claimant's daily activities).

Gwendolyn does not argue that the ALJ erred in relying on any of the cited facts. Instead, Gwendolyn points again to her diagnoses of bilateral shoulder and foot rheumatoid arthritis and evidence of tenderness of her feet, knees, and hips, pain in the balls of her feet, and swelling of her big toes and argues the ALJ ignored this significant medical evidence. But as discussed previously, a diagnosis alone is insufficient to establish the existence of specific functional limitations. *Richards v. Berryhill*, 743 F. App'x 26, 30 (7th Cir. 2018); *Collins v. Barnhart*, 114 F. App'x 229, 234 (7th Cir. 2004)) ("[T]he existence of these conditions alone does not prove that the conditions so functionally limited [the claimant] as to render her completely disabled during the relevant period.").

As noted above, the ALJ explicitly considered Gwendolyn's shoulder condition. (R. 20). The ALJ also expressly considered evidence pertaining to Gwendolyn's knees. *Id*. at 20-21. He

acknowledged that Gwendolyn complained of knee pain and expressly examined the impact of her degenerative joint disease of her knees on her RFC. *Id.* The ALJ cited to Gwendolyn's x-rays demonstrating only minimal degenerative changes and joint space loss of the left knee and minimal degenerative changes and mild joint space loss of the right knee. *Id.* at 20, 21, 372, 375, 950. The ALJ explained that on recent physical examinations, Gwendolyn showed normal ambulation with no acute distress. *Id.* at 21, 869, 872, 1012, 1015, 1018, 1022, 1025, 1029. The ALJ found that Gwendolyn's knee impairments caused certain postural and environmental limitations as well as her need for a cane in standing and walking and contributed to her sedentary exertional limitations. *Id.* at 21. Additionally, as detailed above, while the ALJ did not explicitly discuss Gwendolyn's hips and feet symptoms, he specifically referenced treatment notes indicating Gwendolyn complained of pain in her feet, reported pain in her feet improved with medication, and x-rays of her feet revealed only minor degenerative changes. *Id.* at 20 (*citing id.* at 834, 844); *id.* at 21 (*citing id.* at 869). As part of his RFC analysis, the ALJ also cited Dr. Malapati's November 9, 2017 treatment record, which evidences Gwendolyn's report of hip pain, and considered the report of consultative examiner Dr. Patel who found Gwendolyn's hips normal on examination. *Id.* at 20-21, 768, 834.

In discounting her treating physicians' opinions, Gwendolyn relatedly argues that the ALJ improperly "ignored evidence of multiple occasions" in which her symptoms were heightened or not well controlled by medication. Doc. 21 at 11-12. She claims these additional symptoms and findings support her allegation that she is unable to maintain a sitting or standing position for prolonged periods.[6] Both Dr. Torres and Dr. Malapati found that Gwendolyn had limitations in

---

[6]     In fact, one treatment note Gwendolyn cites from May 2018 reflects Gwendolyn reported "feel[ing] better" and her rheumatoid arthritis "symptoms improved. (R. 996). On another occasion when Gwendolyn reported "slightly worsening of generalized pain as well as pain in her hands," she has been off prednisone for five weeks. *Id.* at 875.

her ability to sit and stand for prolonged periods. (R. 968, 976). It is true that the ALJ's decision did not mention every piece of evidence Gwendolyn cites, but it did not need to. *Deborah M.*, 994 F.3d at 788. "And the presence of contradictory evidence and arguments does not mean the ALJ's determination is not supported by substantial evidence." *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021).

In any event, the ALJ did cite some of the exact pages of the record that Gwendolyn contends were ignored. (R. 19, 20, 21, 23, 822, 834, 839, 869, 1012, 1018, 1022). The ALJ also cited Dr. Patel's December 2017 report, the same report Gwendolyn claims establishes that she cannot sit for prolonged periods. *Id.* at 20-21. Consistent with the ALJ's description, the consultative examination results reflect that Gwendolyn became uncomfortable after sitting in a chair for only five minutes, exhibited significant stiffness in her knees and moderate stiffness in her back with "excruciating" pain in her knees, could not stand with her feet together, walked with an unsteady gait, took excessive time to stand from a seated position, and was unable to perform heel or toe walking, squat and arise, get on and off the examination table, or walk 50 feet without her cane. *Id.* at 20-21, 767-68, 770. However, for his RFC finding, the ALJ relied in part on state agency physicians Drs. Panepinto's and Ryan's opinions. *Id.* 22-23. Drs. Panepinto and Ryan expressly considered the results of the Dr. Patel's consultative examination findings in assessing Gwendolyn's functional limitations and nevertheless concluded that she was capable of a reduced range of sedentary work. *Id.* at 77, 79-82, 973-74. Specifically, Dr. Ryan found that the "[e]xhibited findings at the [consultative examination] regarding severity of knee pain and gait appear disproportionate to the remainder of the [medical evidence record]." *Id.* at 974. The ALJ was entitled to rely on these opinions and reasonably found that aside from the consultative

examination, Gwendolyn's knee and back impairments have generally had mild to moderate symptoms. *Id*. at 22.

Finally, Gwendolyn criticizes the ALJ for failing to consider that Drs. Torres's and Malapati's opinions with respect to her sitting limitation, were consistent with each other and the observations of Dr. Patel and with respect to her staying on task limitation, were consistent with each, suggesting that these similarities bolster their persuasiveness. In evaluating the opinions, the ALJ acknowledged that Drs. Torres's and Malapati's opinions concurred with respect to a need for a sit/stand option and being off task 15% or more of a workday. (R. 23). "However, the fact that those three opinions are purportedly consistent with each other does not, in and of itself, establish that any of the opinions were entitled to greater weight or that the ALJ erred." *Gunder v. Saul*, 2021 WL 2350063, at *11 (E.D. Wis. June 9, 2021). The regulations require the ALJ to assess how consistent an opinion is with the entire record as a whole, not only with another opinion. 20 C.F.R. § 404.1520c(c)(2). Because the ALJ provided sufficient reasons supported by the record for discounting Dr. Torres's and Dr. Malapati's opinions, including inconsistencies with the medical and other evidence of record, the ALJ did not err in evaluating the treating opinion evidence.

## C.  Past Relevant Work

Gwendolyn lastly argues that the ALJ committed reversible error in finding her capable of performing her past relevant work. To determine whether a claimant is "physically capable of returning to her former work, the administrative law judge . . . must ascertain the demands of that work in relation to the claimant's present physical capacities." *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984). At step four, a "claimant is not disabled if he can do his past relevant

work either in the manner he performed it before the impairment *or* in the manner it is generally performed in the national economy." *Ray v. Berryhill*, 915 F.3d 486, 491 (7th Cir. 2019).

Relying on the testimony of the vocational expert, the ALJ found at step four that Gwendolyn could perform her past relevant work as a user support analyst as generally performed. (R. 24, 58-59). Gwendolyn argues that the ALJ's finding that she can do her past user support analyst work as generally performed is not supported by substantial evidence because the job requires constant speaking and she is limited in her speaking ability. An ALJ "is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir. 2007). Substantial evidence supports the ALJ's failure to include a speaking limitation in the RFC and hypothetical. Gwendolyn points to January and August 2017 treatment notes from otolaryngologist J. Ortega, M.D., but this evidence does not establish any speaking limitations beyond August 2017. The record reflects that Gwendolyn underwent a thyroidectomy in October 2016 and immediately reported problems with her voice. (R. 641). Gwendolyn was referred to Dr. Ortega after experiencing hoarseness, inability to sing, and fullness in her throat. *Id*. at 706. Between January and August 2017, Gwendolyn saw Dr. Ortega five times. *Id*. at 641-714. During her last visit with Dr. Ortega on August 4, 2017, Gwendolyn reported continued improvement with her voice and described her voice as becoming "somewhat hoarse and weak" with speaking for long periods of time. *Id*. at 641. Dr. Ortega assessed a "very slight weakness to the left vocal cord" but found Gwendolyn had "essentially a normal voice." *Id*. at 644. Dr. Ortega advised Gwendolyn that she may be sensitive to overuse of her voice as well as allergies and reflux but recommended the use of medications if she experiences these problems. *Id*. Dr. Ortega advised Gwendolyn to return for a follow-up in 6 months because "she [was] doing so well." *Id*. Notably, Gwendolyn did not return to Dr. Ortega or seek further

treatment from any provider for her left vocal cord. In fact, on six occasions between November 2017 and November 2018, Gwendolyn denied difficulty speaking. *Id*. at 841, 846, 853, 860, 983, 999.

To support her claim of a speaking limitation, Gwendolyn also notes that in December 2017 and at the reconsideration level, state agency physician Dr. Panepinto concluded that Gwendolyn was limited to occasional speaking. (R. 80). However, in September 2017, the initial reviewing physician Dr. Bilinsky did not find any speaking limitation, nor did reviewing physician Dr. Ryan in July 2018. *Id*. at 68, 973-74. All three reviewers noted that Gwendolyn's throat surgery "appears to have only affected her ability to sing, not speak." *Id*. at 68, 79, 972. The ALJ found the prior administrative medical findings somewhat supportable and consistent with the record. *Id*. at 22. In assessing Gwendolyn's RFC, the ALJ relied on them in part in crafting an RFC determination for a reduced range of sedentary work without a speaking limitation. *Id*. at 22-23. The ALJ was not required to adopt Dr. Panepinto's prior administrative medical finding in its entirety. 20 C.F.R. § 404.1520c(a); *Schmidt*, 496 F.3d at 845 ("an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion . . . ."). With no treatment records showing Gwendolyn experienced speaking difficulties during the period after August 2017, the ALJ's refusal to include a speaking limitation in the RFC is substantially supported. Ultimately, Gwendolyn bore the burden of proving the existence and severity of limitations caused by her left vocal cord condition, but she has failed to carry her burden of showing any speaking difficulties or limitations after August 2017. *Weaver*, 746 F. App'x at 579. As a result, the ALJ's decision to accept the VE's testimony that Gwendolyn can perform her past relevant work as a user support analyst as the work is generally performed is supported by substantial evidence.

Gwendolyn also argues that the ALJ erred in finding that she can perform the user support analyst work as she actually performed it. Contrary to Gwendolyn's assertion, the ALJ clearly found that she could perform her past relevant work "as generally performed" not as actually performed. (R. 24). In any event, substantial evidence supports the ALJ's finding that Gwendolyn can perform her past relevant work as generally performed and the "ability to work a past job as it is generally performed is all that it needed to satisfy Step Four." *Joseph M. v. Saul*, 2019 WL 6918281, at *16 (N.D. Ill. Dec. 19, 2019). Accordingly, there is no error in the ALJ's step four analysis and his findings are supported by substantial evidence.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [22] is denied, the Commissioner's Motion for Summary Judgment [26] is granted, and the ALJ's decision is affirmed. The Clerk is directed to enter judgment in favor of the Acting Commissioner and against Plaintiff.

**SO ORDERED.**

Dated:  November 9, 2021

Sunil R. Harjani
United States Magistrate Judge